Willia… BRADY and Theresa
Brady, Plaintiffs,

v.

Maryann DILL, Kenneth J. Hudson, Jr.,
Thomas Majenski, Douglas Mendes, and
Steve Vrona, Charles F. Henderson, the
Commonwealth of Massachusetts, Mas-
sachusetts State Police, Defendants.

No. CIV. A. 96–11405–NG.

United States District Court,
D. Massachusetts.

Oct. 16, 1998.

Richard J. Sinnott, Philip A. Tracy, Jr., Boston, MA, for William Brady, Theresa Brady, Plaintiffs.

Joseph P. Kittredge, Law Offices of Timothy M. Burke, Needham, Michelle A. Kaczynski, Office of the Attorney General, Government Bureau/Trial, Boston, MA, for Maryann Dill, Kenneth J. Hudson, Jr., Thomas Majenski, Douglas Mendes, Steve Vrona, Charles F. Henderson, Defendants.

## *MEMORANDUM AND ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT*

GERTNER, District Judge.

### I. *INTRODUCTION*

This is a case of mistaken identity which led to an arrest and detention. The plaintiffs, William Brady and Theresa Brady, ("plaintiffs") seek to hold the defendant members of the Massachusetts State Police force and Rockland Police force—Sergeant Maryann Dill ("Dill"), Trooper Kenneth J. Hudson, Jr. ("Hudson"), Trooper Thomas Majenski ("Majenski"), Trooper Douglas Mendes ("Mendes"), Trooper Steve Vrona ("Vrona"), and Colonel Charles Henderson ("Henderson")—jointly and severally liable for holding William Brady ("Brady") in jail thirty-three (33) hours after some of the defendants learned that he was not the person wanted by the warrant made out in his name. Listing five separate counts, plaintiffs seek damages for violations of Brady's federal and state constitutional rights, including freedom from unreasonable search and seizure and freedom from wrongful imprison-

---

1. Plaintiffs list five counts in their complaint:
   - I: 42 U.S.C. § 1983 action for violations of rights secured by the Fourteenth Amendment;
   - II: M.G.L. c. 12 § 111 Mass. Civil Rights Act action for wrongful imprisonment;

ment, and for emotional distress caused to both Mr. and Mrs. Brady.[1]

Presently before this court are two motions by separate groups of defendants for summary judgment on all five counts. For the reasons set forth below, defendant Henderson's motion [docket # 37] for summary judgment and defendant Majenski's motion for summary judgment [docket # 39] are **GRANTED**. But the motion of the remaining defendants [docket # 39] for summary judgment is **DENIED**.

■ Plaintiffs also name the Commonwealth of Massachusetts and the Massachusetts State Police as defendants. 42 U.S.C. § 1983, however, plainly does not apply to states or state agencies. *Will v. Michigan Department of State Police*, 491 U.S. 58, 70–71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Therefore, with respect to this claim, plaintiffs fail to state a claim upon which relief can be granted. Fed. R. Civ. Pro. 12(b)(6).

Nor can plaintiffs, by appealing to pendant-party jurisdiction, keep these two defendants for the purpose of their various state law claims. The exercise of jurisdiction in circumstances like this was squarely addressed and rejected by the Supreme Court in *Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976). Thus the case against the Commonwealth and State Police is **DISMISSED**.

### II. *SUMMARY JUDGMENT STANDARD*

A motion for summary judgment will be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *Hinchey v. NYNEX Corp.*, 144 F.3d 134, 140 (1st Cir.1998). The facts must be viewed "in the light most favorable to the non-moving party, drawing all

---

- III: False Imprisonment;
- IV: Intentional Infliction of Emotional Distress (Mr. William Brady);
- V: Intentional Infliction of Emotional Distress (Mrs. Theresa Brady).

reasonable inferences in that party's favor." *Borschow Hospital & Medical Supplies, Inc. v. Cesar Castillo Inc.*, 96 F.3d 10, 14 (1st Cir.1996).

## III. *BACKGROUND*

The following facts are generally conceded. On September 17, 1994, State Trooper Robert Fries ("Fries") arrested a man later identified as David Buckley ("Buckley") for operating a motor vehicle under the influence of alcohol ("OUI"). Buckley did not have a driver's license in his possession, but gave Brady's name, date of birth and social security number as his identification. Buckley later failed to appear in court and a default warrant, using Brady's information, was issued for his arrest.

On Saturday March 4, 1995, at approximately 10:00 p.m., the Rockland Police Department responded to a call that two men were fighting on a public street. When the officers arrived, there was no evidence that the men had actually been fighting, but upon discovering that one of them was Brady, Majenski arrested him on the default warrant. He handcuffed Brady in a way which, according to Brady, caused him shoulder pain.[2] Brady also claims that Majenski told him that he would have to wait to have the handcuffs loosened. Majenski then drove Brady to Kingston, Massachusetts, where he was transferred to the car of State Trooper Cavanaugh and taken the rest of the way to the State Police Barracks in Bourne, Massachusetts.

From the time of his arrest on, Brady protested that he knew nothing about the charges which formed the basis of his arrest, and that his arrest was a mistake. When he got to the Bourne Barracks, Vrona decided to investigate. He had the original arrest report written by Fries, the arresting officer, faxed to him. Though the information on the warrant (name, sex, date of birth, and address) all fit Brady, other information on Fries's report did not. It described a man four inches taller, thirty-five pounds lighter, with different colored eyes and hair, and with a tattoo on his right arm which Brady did not have. Brady's mother's maiden name was also incorrect (although the name was similar). Vrona also spoke directly to Fries who told him that, based on the physical description Vrona offered, he did not believe that Vrona was holding the man Fries arrested.

After learning of the discrepancies between the physical characteristics of the man Fries arrested and the man Vrona had in custody, Vrona questioned Brady about who was using his name. He indicated that he had a "reasonable suspicion" that someone else was using his name. Brady said that was not his problem. Vrona responded that it was his problem since he was the one behind bars. Brady then indicated that he did not know who it was. Pressed further by Vrona whether he did not know or merely did not want to say, Brady responded that the police holding him were "all going to pay for this."

After this exchange, Vrona told his supervisor, Lieutenant Taylor ("Taylor"), what he had learned, and Taylor told Vrona to have Brady bailed out. This is significant in part because under Massachusetts law, M.G.L. c. 276 § 29, a "person arrested on a default warrant for a felony or a misdemeanor punishable by imprisonment for more than one hundred days" may only be released on bail "by a justice of the court having jurisdiction over the place where the person was arrested or is being held, or by a justice of the court that issued the warrant." The penalty for an OUI can be up to two years (M.G.L. c. 90, § 24). If the warrant were correct, the police could properly bail Brady out only if they took him before a justice of a court with the proper jurisdiction. If it were not, they had no basis to hold him.

At approximately 11:30 p.m., Dill arrived at the Bourne Barracks, heard the story from Vrona, and called Fries to confirm the information. She then questioned Brady to see if he had any information about whom the warrant had sought, if not him. Then, shortly after midnight, Dill called the bail commissioner (not a justice with the proper jurisdiction), Robert Kreykenbohm ("Kreykenbohm"). She indicated that the police did

---

**2.** There is, however, no objective medical evidence that Brady suffered an injury.

not feel comfortable that they had the person on whom the warrant was issued.

Within approximately 15 minutes, Kreykenbohm arrived at the barracks. After reviewing the paperwork, he agreed that they might have the wrong man. He then prepared a bail release form, on which Brady would agree to return for the next session of court to straighten out the confused warrant situation. Brady was told that the only way he could be released was if he signed the form, but operating under the misapprehension that by signing a piece of paper containing a list of charges he would be making an admission, he refused to sign. His wife was then told over the telephone that her husband had refused bail and therefore could not be released.

Later that night, Hudson visited Brady in his cell. He too probed to see if Brady knew who the warrant was seeking if not him. Hudson guessed that it might have been his brother or a friend. He said that if Brady told him who it was, he would have Brady released immediately. When Brady said that he had no knowledge of the warrant, Hudson left Brady in his cell.

The next day Brady's father-in-law, Carmen Leone ("Leone"), telephoned the Bourne Barracks and spoke with both Vrona and Mendes, explaining that they were holding the wrong person. Leone was told that Brady was being uncooperative. Leone then called a lawyer, William Phalen ("Phalen"), asking him to look into obtaining Brady's release. Mendes spoke on the phone with Phalen and mistakenly informed him that there was a second OUI charge on Brady. As a result, Phalen abandoned his efforts to get the immediate release of Brady.

On Monday March 6, 1995, at 9:00 a.m., Brady was transported to the Wareham District Court where he was arraigned on the outstanding warrant and released. On March 27, 1995, he was found not guilty of the charges arising from the September 17, 1994, OUI arrest.

## IV. ANALYSIS

### A. The Case Against Defendant Henderson

█ Henderson is being sued, not for his personal role in what happened to Brady (he had none), but insofar as he, as Colonel of the Massachusetts State Police, was its chief policy making official. One of the grounds on which Henderson moves for summary judgment is that he is not "affirmatively linked" to any wrongdoing. He is clearly correct, and summary judgment is GRANTED him on that ground.

Henderson could not be liable to plaintiffs for the actions of state police officers under a theory of *respondeat superior. See Monell v. Dept. of Social Services*, 436 U.S. 658, 694–95 & n. 58, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Rather, given that he had no direct contact with Brady, he can be found liable only if the policies he instituted or fostered showed deliberate indifference to Brady's constitutional rights. *City of Canton v. Harris*, 489 U.S. 378, 388–89, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

Plaintiffs contend that Henderson caused the violation of Brady's constitutional rights by tolerating or instituting a number of faulty policies, such as improper identification procedure and improper training of troopers in bail laws. But even if I grant what is not yet established, that Brady's constitutional rights were violated by holding him 33 hours beyond the time at which some of the defendants knew that he was not the person wanted by the warrant, plaintiffs have offered no link to Henderson. For example, a supervisor may be liable "if there exists a known history of widespread abuse sufficient to alert a supervisor to ongoing violations." *Maldonado–Denis v. Castillo–Rodriguez*, 23 F.3d 576, 582 (1st Cir.1994). *See also Britton v. Maloney*, 901 F.Supp. 444, 449 (D.Mass.1995) (supervisory liability exists for unwritten or informal policies only when those policies "result from a deliberate choice to follow a course of action") (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)) (internal quotation marks omitted). Plaintiffs have presented only the most indirect evidence of widespread abuse, and no evidence to show that Henderson must have been aware of it and made a deliberate choice to foster or tolerate it.

Citing *Bordanaro v. McLeod,* 871 F.2d 1151 (1st Cir.1989), plaintiffs argue that the entire night watch was indifferent to Brady's improper detention, thus demonstrating that they were operating under a shared set of policies and customs. The implicit premise is that Henderson must have been aware of and condoned these policies and customs. The argument is specious. In *Bordanaro,* a systematic analysis of the recruitment, training, supervision and disciplinary procedures of the police department, prepared by an expert, provided the basis for the court's conclusion that the force was "ill prepared and ill equipped to perform the obvious and recurring duties of police officers." 871 F.2d at 1162. Nothing in the record here rises to that level.

### B. *The Case Against Defendant Majenski*

■ The rest of Plaintiffs' case is against officers who were directly involved in Brady's detention. All of these defendants, except Majenski, were involved in the period of time after it became clear that there were serious discrepancies between the physical description of the man wanted by the warrant and the person named on the warrant. Majenski, by contrast, had contact with Brady only during the initial arrest and during part of the trip to the Bourne Barracks. When Majenski arrested Brady he did so under the authority of a facially valid warrant. Plaintiffs' only complaint against Majenski, then, is that he used excessive force in arresting and handcuffing Brady, and thereby violated his constitutional rights.

The cases cited by plaintiffs fail to come even close to demonstrating that there is a trialworthy claim here. *Alexis v. McDonald's Restaurants of Massachusetts, Inc.,* 67 F.3d 341 (1st Cir.1995) involved a woman who was abruptly pulled from her booth in the restaurant, thereby bruising her legs, and then dragged and carried to a police cruiser where she was pushed inside. This was particularly egregious because the crime for which she was arrested was the misdemeanor of criminal trespass, and because she was not even given the opportunity to get up and cooperate on her own. The court held that it was a triable issue whether such conduct was objectively unreasonable.

Brady's case and treatment are quite different. Brady was not dragged across the ground. There is no objective evidence of any physical damage.

The other cases are no better for plaintiffs. The plaintiff in *Palmer v. Sanderson,* 9 F.3d 1433 (9th Cir.1993), a sixty-seven year old man, was jerked from his car, pushed against it, and handcuffed so tightly as to cause pain and discoloration in his wrists. He had a trialworthy excessive force claim. The plaintiff in *Rowland v. Perry,* 41 F.3d 167 (4th Cir.1994) was punched, thrown to the ground, and subjected to a wrestling move which cracked the anterior cruciate ligament in his knee. He had a trialworthy excessive force claim.

Plaintiffs here describe a routine handcuffing which caused pain and discomfort but no more lasting injury to Brady's shoulder. Such an event does not rise to the level of a constitutional violation on the "objective reasonable" standard described in *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). . Summary judgment for Majenski is therefore GRANTED.

### C. *The Case Against the Remaining Four Defendants*

According to plaintiffs' submissions and the inferences that can be drawn from them, defendants Dill, Hudson, Mendes, and Vrona (henceforth "defendants") were all involved in Brady's detention after it became clear that he did not have the same physical characteristics as the man wanted by the warrant. Their motions for summary judgment on all counts turn on two arguments. First, they claim that they did not violate Brady's constitutional rights because they were acting on the authority of a facially valid warrant. Second, they claim that they benefit from qualified immunity for actions taken in the course of their official duty. These claims will be discussed in turn.

#### 1. *Brady's Constitutional Rights Violation*

■ Plaintiffs claim that their submissions and the reasonable inferences that may be

drawn from them establish a materially contested issue: whether the defendants had *actual knowledge* that Brady was not the man wanted on the default warrant. It is clear that there would be no liability for an affirmative failure to investigate whether Brady was the man wanted on the warrant, where the warrant was facially valid and no credible evidence suggested otherwise. The Supreme Court, discussing a case in which a man was arrested and detained for three days on a warrant that should have named his brother but was made out mistakenly in his name, said that "the official charged with maintaining custody of the accused named in the warrant [is not] required by the Constitution to perform an error-free investigation of [a claim of mistaken identity]." *Baker v. McCollan,* 443 U.S. 137, 146, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979).

But whether one has a duty to act if one *knows* of mistaken identity is a different matter. To the extent that liability depends on actual knowledge, whether the defendants had such knowledge is a triable issue.

Plaintiffs rely primarily on two cases for the proposition that the defendants violated Brady's constitutional rights by detaining him after they had actual knowledge that he was not the man wanted on the warrant. First, they rely on *Gay v. Wall,* 761 F.2d 175 (4th Cir.1985). That case involved a plaintiff who, like Brady, claimed to have been held in prison even though the police knew he was innocent.[3] The district court granted summary judgment for the defendants on the grounds that, "under *Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979), a mistaken arrest and detention pursuant to a facially valid warrant is not unconstitutional." 761 F.2d at 177. The circuit court reversed, distinguishing Gay's situation from McCollan's. McCollan contended that "state officials *should have* determined, through some affirmative inquiry that the plaintiff was innocent." *Id.* at 178. By contrast, Gay contended "that the defendants had actual knowledge of his innocence, yet detained him until they could find the right

man." *Id.* The court concluded: "If Gay's allegations are true that the defendants deprived him of his liberty beyond a time when they knew him to be innocent, the defendants' conduct may well be actionable under § 1983." *Id.* at 179.

Second, plaintiffs rely on Judge Cudahy's opinion concurring in part and dissenting in part in *Garcia v. City of Chicago, Ill.,* 24 F.3d 966 (7th Cir.1994). That case involved a plaintiff who was held for 15 days after it was discovered that the white powdered substance, possession of which was the only grounds for his arrest, was not a controlled substance. Judge Cudahy said that *Baker* "only permitted pre-trial detention after a valid arrest pursuant to a valid warrant *until* it was discovered that the detainee was not the person sought." 24 F.3d at 974 (quoting from *Powe v. City of Chicago,* 664 F.2d 639, 651–52 (7th Cir.1981)) (embedded quotation marks and square brackets omitted). Once the prosecutor found out that Garcia was not in possession of any illegal drugs, "The situation was exactly as if the authorities had found that they had arrested the wrong person. In those circumstances ... continued pre-trial detention cannot be justified." 24 F.3d at 974.[4]

Defendants counter as follows: First, they point out that the Fourth Circuit has repudiated *Gay*'s reasoning in *Taylor v. Waters,* 81 F.3d 429 (4th Cir.1996), and in *Brooks v. City of Winston–Salem, N.C.,* 85 F.3d 178 (1996). Both cases relied on *Albright v. Oliver,* 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) for their criticism of *Gay. Albright,* in a fractured decision, held that there is no substantive due process right to be free from prosecution without probable cause. If there were to be any such right, it would have to be grounded in the less general Fourth Amendment freedom from unreasonable searches and seizures. 510 U.S. at 274, 114 S.Ct. 807.

But *Taylor, Brooks* and, notably, *Albright* did not address the issue raised here: not the continued *prosecution* of a criminal com-

---

3. There is a difference of three weeks, versus 33 hours, but the principle is the same.

4. The majority in *Garcia* held that it was a matter of prosecutorial discretion whether a prosecutor decides to drop a case on the basis of exculpatory evidence. 24 F.3d at 971.

plaint after the officers had actual knowledge of the defendant's innocence, but the continued pre-trial *detention* of the defendant. Moreover, the Fourth Circuit in *Gay* and Judge Cudahy in *Brooks,* writing before the Supreme Court's decision in *Albright,* characterized challenges to wrongful detention as raising substantive due process concerns. Plaintiffs here do not. Brady claims to have been subject to continuing *seizure* even when, it is alleged, defendants knew that there was no probable cause to support his seizure.[5] Whatever evolves out of the debate swirling around the multiple decisions in *Albright* as applied to prosecution without probable cause, one thing is clear: the physical seizure of a citizen raises Fourth Amendment issues.[6]

If a jury finds that defendants knew that Brady was not really the man wanted by the warrant, then they could also conclude that the defendants violated Brady's Fourth Amendment right to be free from unreasonable seizure. Interpreting the evidence in the light most favorable to the plaintiffs, it is plausible that defendants *did* know—once they got Fries' original arrest report, spoke to Fries, and realized that Brady did not fit the physical description of the man arrested at all— that they had the wrong man. It is, in short, the quintessential jury question.

## 2. *Qualified Immunity*

█ There are two parts to any qualified immunity analysis. First, it must be determined whether the right asserted by the plaintiffs was "clearly established" at the time of the alleged violation. Second, it must be determined whether the defendants' conduct was "objectively legally reasonable" in light of the information they possessed at the time of the alleged violation. *See Anderson v. Creighton,* 483 U.S. 635, 640–41, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

### (a) *Whether the Right was "Clearly Established"*

█ Defendants argue they should win on summary judgment on the basis of the first prong alone. Even if their holding Brady beyond a certain point in time was unlawful, they argue that they are protected by qualified immunity because the unlawfulness of their actions was not apparent in the light of pre-existing law. *See Id.*[7] Thus, the first question is whether their conduct violated a clearly established constitutional right; again assuming that a jury could reasonably find a crucial fact, namely, that the defendants knew that Brady was not the man wanted by the warrant.

Defendants argue that their conduct did not violate a clearly established constitutional right because they were acting pursuant to a facially valid warrant. The problem with this argument is that it does not address the implications of plaintiffs' proof that at some point they knew that the warrant was in error.[8]

In a sense, this principle is no different from one found in traditional, long estab-

[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

---

5. In Count One of plaintiffs' complaint they list as one of the constitutional violations that Brady suffered the violation of his "freedom from unreasonable search and seizure." This is clearly an implicit reference to his Fourth Amendment rights.

6. *Cf Britton v. Maloney,* 981 F.Supp. 25, 35 (D.Mass.1997) (*"Britton II"*). In *Britton II,* I concluded that the claim of prosecution without probable cause can fall under the Fourth Amendment, and thus is still actionable after *Albright.* The claim was that officers brought charges against Britton when they did not have probable cause to believe he had committed any crime, merely to punish him for trying to get them to return his weapon—which he lawfully purchased and carried.

7. In *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) the Court noted:

8. It is unclear whether the warrant should be considered invalid once it is apparent that it is erroneous. On the one hand, a warrant is meant to certify that probable cause to arrest and detain someone exists. Once it is apparent that probable cause does not exist for the person named on the warrant, then the warrant cannot validly be used to justify his arrest or detention. On the other hand, there is reason to think that a warrant can be technically valid even when it is clearly erroneous. As the Supreme Court said in *Garrison* : "evidence that emerge[s] after the warrant is issued ha[s] no bearing on whether or not a warrant was validly issued," and "[t]he validity of the warrant must be assessed on the

lished Fourth Amendment search law: that searching officers must stop their search of a given premises once they become aware of a mistake in the warrant. In *Maryland v. Garrison*, 480 U.S. 79, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987), for example, the police relied on an overly broad warrant to enter Garrison's apartment where they found controlled substances and related paraphernalia. The warrant led them to believe that there was only one apartment on the third floor of a building, where in truth there were two. They had probable cause to enter the one occupied by Mr. McWebb, but there was no probable cause for entering Garrison's apartment. The Court held that the error in the warrant did not invalidate it. The search was valid because the police had no reason to know that the warrant was overly broad until they had entered the second apartment and had found the contraband. What is relevant to the present case, however, is the Court's language describing the officers' duty to restrict their behavior once they become aware of the mistake in the warrant:

> If the officers had known, or should have known, that the third floor contained two apartments before they entered the living quarters on the third floor, and thus had been aware of the error in the warrant, they would have been obliged to limit their search to McWebb's apartment. Moreover, as the officers recognized, they were required to discontinue the search of respondent's apartment as soon as they discovered that there were two separate units on the third floor and therefore were on notice of the risk that they might be in a unit erroneously included within the terms of the warrant. 480 U.S. at 86–87[, 107 S.Ct. 1013].

The implication for Brady's case is clear. If the defendants discovered that Brady was not the man wanted on the warrant, then at that point they were on notice that they had no right to continue detaining him; they had to release him.

basis of the information that the officers disclosed, or had a duty to discover and disclose, to the issuing Magistrate." 480 U.S. at 85, 107 S.Ct. 1013. *See also* the discussion in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (emphasizing the relevance of probable cause at the time the affidavit was made before the judge).

### (b) *Whether the Conduct was "Objectively Legally Reasonable."*

■ Defendants also appeal to the second prong of the qualified immunity test. They cite *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034, for the proposition that for an act to fall outside the scope of qualified immunity, "the unlawfulness must be apparent," in light of what is known to the officer at the time of the act. Whether they are protected by qualified immunity will depend entirely on the facts adduced at trial. If the facts show that during the period of Brady's detention defendants knew they were holding the wrong man, no case, recent or aged, would justify their continued detention of him.

Making the case somewhat harder for defendants is the fact that they offered Brady bail. Assuming that they knew that a person wanted on a default warrant can be offered bail only by a justice of the court having jurisdiction over the place where he was held or a justice of the court that issued the warrant, M.G.L. c. 276 § 29, their offering to bail him was arguably an admission that they had the wrong man. Moreover, if a jury were to conclude that at the moment the police offered bail to Brady they knew he was the wrong man, then their behavior was clearly a violation of the Fourth Amendment. The point could not be more simple: Innocent citizens, for whom there is no probable cause to believe that they have committed a crime, need not be *bailed.* They are simply set free.

■ The attempt by the police essentially to split the difference—the difference between, on the one hand, following a law which says that a person wanted on a default warrant can be released only by a justice of a court with the proper jurisdiction, and, on the other hand, releasing a person who they know to be innocent—by offering Brady bail may be entirely understandable, but it is not

Even if a clearly erroneous warrant is considered technically valid, the underlying point still stands, namely that it cannot be used to justify the continued detention of the named person once the error is known.

protected by qualified immunity. Qualified immunity is designed to shield officials who had a reasonable, albeit mistaken view, of their right to take the actions they did. *See Cookish v. Powell,* 945 F.2d 441, 443 (1st Cir.1991). It is not designed to shield officials "who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). M.G.L. C. 276 § 29, is completely clear and offering bail to Brady was a knowing violation of the law. If they did not know that Brady was not the man wanted on the warrant, then offering him bail would be a sympathetic violation on Brady's behalf, one for which Brady arguably could not hold them liable. But if they did know that he was not the man wanted by the warrant, then conditioning his release on signing a bail form was both a violation of his Fourth Amendment rights and an illegal act not protected by qualified immunity.

To be clear, I am not saying that defendants cannot benefit from qualified immunity at all. I am holding here that the right not to be held under a warrant once the police know that the warrant is seeking someone else was clear at the time Brady was detained. Whether the defendants behaved in a reasonable way depends on what a jury finds they knew and when they knew it. If the jury concludes that they had vague reservations they had the wrong man, that would be one thing. If concluded that they had actual knowledge, it would be another. This question is "highly fact specific" and "may not be resolved on a motion for summary judgment when material facts are substantively in dispute." *Swain v. Spinney,* 117 F.3d 1, 9 (1st Cir.1997); *see also Prokey v. Watkins,* 942 F.2d 67 (1st Cir.1991) (calling for a fact finder if a police officer's having had probable cause turned on what he knew prior to the arrest).[9]

## V.  *CONCLUSION*

Accordingly, I **ALLOW** summary judgment for defendants Majenski [docket # 39] and Henderson [docket # 37]. I **DISMISS**

for failure to state a claim and lack of pendant-party jurisdiction all counts against The Commonwealth of Massachusetts and the Massachusetts State Police. I **DENY** summary judgment to defendants Dill, Hudson, Mendes, and Vrona [docket # 39] on all counts.

It may be that this outcome—no qualified immunity where there is a facially valid warrant; the potential for a jury to conclude the police knew they had the wrong man—will create a disincentive for police to even question a facially valid warrant lest facts come into their possession that will lead a jury to second guess them. But the opposite rule—qualified immunity where a factfinder could find actual knowledge that the police had the wrong man—is even more problematic.

Proof of an unlawful state of mind, a knowing violation of law or even bad faith, always trumps even what may on the surface seem objectively reasonable.

SO ORDERED.

---

**9.** It has been noted elsewhere that in Fourth Amendment cases qualified immunity and a determination that no substantive violation has occurred often go hand in hand. The reason cited was that "the focus in the usual Fourth Amendment qualified immunity analysis is not whether it is 'clearly established' that an unreasonable search and seizure would violate the Constitution but rather whether a particular search and seizure was, in fact, unreasonable." *Duca v. Martins,* 941 F.Supp. 1281, 1293 n. 11 (D.Mass. 1996).