Reid v. Simmons, et al.          CV-89-152-M    03/30/01
                    UNITED STATES DISTRICT COURT

                      DISTRICT OF NEW HAMPSHIRE


Gordon C. Reid

     v.                                Civil No. 89-152-M
                                       Opinion No. 2001 DNH 065

Officers Gary Simmons, Ronald Paul,
James Ahern, and Richard Gilman,


                           O R D E R


     In July of 2000, this case was tried before a jury on Gordon

Reid's claim that Defendant, Officer Simmons, violated his

constitutionally protected right to due process and a fair

criminal trial by failing to disclose exculpatory impeachment

evidence to the attorneys who prosecuted Reid in state court.

See 42 U.S.C. § 1983.  See generally Brady v. Maryland, 373 U.S.

83 (1963).  The jury returned a verdict in favor of Reid,

concluding that Simmons' conduct violated Reid's federally

protected rights.  Simmons now moves for judgment as a matter of

law.  See Fed. R. Civ. P. 50.  In the alternative, he moves for a

new trial.  See Fed. R. Civ. P. 59(a).  For the reasons set forth

below, Simmons is entitled to judgment as a matter of law or, in

the alternative, a new trial.

## Standard of Review

Under Rule 50 of the Federal Rules of Civil Procedure, a motion for judgment as a matter of law will be granted:

> only in those instances where, after having examined the evidence as well as all permissible inferences drawn therefrom in the light most favorable to non-movant, the court finds that a reasonable jury could not render a verdict in that party's favor.  In carrying out this analysis the court may not take into account the credibility of witnesses, resolve evidentiary conflicts, nor ponder the weight of the evidence introduced at trial.

Irvine v. Murad Skin Research Labs., Inc., 194 F.3d 313, 316-17 (1st Cir.) (internal citations omitted), cert. dismissed 528 U.S. 1041 (1999).  See also Negron v. Caleb Brett U.S.A., Inc., 212 F.3d 666, 668 (1st Cir. 2000).

Rule 59(a) of the Federal Rules of Civil Procedure provides, in pertinent part, that "[a] new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States . . . ." Grounds for a new trial include a verdict that is against the great weight of the evidence, or a damage award that is

excessive, or a verdict that is so mistaken as to constitute a miscarriage of justice, or a trial that was not fair to the moving party due to substantial errors in the admission or rejection of evidence.  See Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 433 (1996); Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251 (1940); Transamerica Premier Ins. Co. v. Ober, 107 F.3d 925, 929 (1st Cir. 1997).


## Background

The facts underlying this case have been discussed at length in several opinions issued by this court, see, e.g., Reid v. Simmons No. 89-152-M (D.N.H. March 6, 1998), and in two opinions by the court of appeals.  See Reid v. State of New Hampshire, 56 F.3d 332 (1st Cir. 1995) ("Reid I"); and Reid v. Simmons, No. 98-1366, 1999 WL 525926 (1st Cir. April 15, 1999) ("Reid II").  Consequently, the court recounts only those facts critical to the resolution of the pending motions.


In June of 1986, Reid was arrested and charged with three counts of felonious sexual assault upon a six-year old girl ("Misty").  Defendant, Officer Simmons, testified at Reid's probable cause hearing, after which Reid was bound over for

3

trial.  See Reid I, 56 F.3d at 334.  At the subsequent criminal trial, Reid represented himself, with the assistance of stand-by counsel.  The jury acquitted Reid on one count and convicted him of the charges in the remaining two counts.  Reid moved to set aside those convictions.

In September of 1988, in response to post-trial discovery motions filed by Reid, the State produced documents that arguably tended to undermine the credibility of both Reid's alleged victim, Misty, and her mother.  Those documents included Manchester Police Department reports dated December, 1985, and April, 1986, that had been prepared by Simmons, but related to prior investigations into whether Misty had been sexually abused (alleged incidents in which Reid was not a suspect).  As the court of appeals acknowledged, however, "On their face, the reports do not indicate that Misty falsely accused anyone.  The 1985 report indicates that Misty had been sexually abused by a person or persons unknown.  The 1986 report states that Misty denied allegations made by a neighbor, who complained that Misty had been sexually abused by a man referred to simply as 'George.'"  Reid I, 56 F.3d at 334 n.2 (emphasis in original).  Thus, the exculpatory nature of those reports was, at a minimum,

4

not self-evident.  Nevertheless, a state court judge concluded that information in those reports "would have been favorable to [Reid] under the Brady test.  It was exculpatory in nature and it would have assisted the defendant in an effective cross-examination of several important State witnesses, including the victim."  State v. Reid, Nos. S-86-1819 through 1821, slip. op. at 3 (Hillsborough Superior Ct. Oct. 13, 1988) (emphasis in original).  Consequently, the state court vacated Reid's convictions.

Later, the State declined to reprosecute and dropped all charges against Reid.  Reid then filed this civil suit, in which he brought claims against numerous defendants.  Eventually, after extensive litigation, his multiple claims were reduced to one - a § 1983 claim against Simmons, a police officer, for having allegedly violated Reid's federally protected rights by failing to turn over to prosecutors the two investigative reports from the other case files pertaining to Misty.  See generally Brady, supra.  According to Reid, those reports could have been effectively used at his criminal trial to impeach the testimony of Misty by, among other things, showing that she could have acquired her knowledge of adult sexual behavior from prior

5

incidents of sexual abuse, rather than from the alleged assault with which Reid was charged.

## Discussion

Although it implicates a number of complex legal issues, the fundamental question presented by the pending motions can be stated simply: whether this police officer defendant can be held liable under § 1983 for having failed to provide prosecutors with investigative reports he prepared in unrelated prior criminal investigations (i.e., not involving the alleged incident for which plaintiff was prosecuted) that, at least to one trained in criminal trial practice, were of potential impeachment value to the defense.

Of course, a police officer's <u>Brady</u> obligation to reveal exculpatory evidence to the prosecution only applies to evidence that is "material." <u>See</u> <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985); <u>Kyles v. Whitley</u>, 514 U.S. 419, 434 (1995). And, determining whether <u>Brady</u> was violated - that is, whether undisclosed evidence was both exculpatory and material - is an analysis that is necessarily undertaken after the criminal trial, with the acute clarity of hindsight. <u>See</u> <u>McMillian v. Johnson</u>,

6

88 F.3d 1554, 1569-70 (11th Cir.), amended by 101 F.3d 1363 (11th Cir. 1996). Consequently, one of the difficult issues presented in this case is whether Simmons recognized (or should have recognized), prior to Reid's trial, that the investigative reports at issue were, or were likely to be, both exculpatory and material to Reid's defense.

The complex issues raised in cases such as this require courts to define the circumstances under which police officers may be held civilly liable for Brady violations - a matter of considerable uncertainty. The judges of the Fourth Circuit Court of Appeals are, for example, decidedly split on where the lines should be drawn in cases involving alleged constitutional violations by police officers who fail to inform prosecutors of potentially exculpatory material in police investigative files. See Jean v. Collins, 221 F.3d 656 (4th Cir. 2000) (en banc), cert. denied, 121 S.Ct. 771 (2001).

In this case, several factors persuade the court that the evidence produced at trial is insufficient to support the jury's verdict in favor of Reid and, instead, that Simmons is entitled

7

to judgment as a matter of law.  At a minimum, the record evidence is such that Simmons is entitled to a new trial.

I.    No Evidence of Simmons' Failure to Disclose the Reports.

In the ordinary case, a police officer fulfills his or her obligations under Brady by turning over to prosecutors all evidence and reports generated in the course of investigating the criminal defendant.  Under those circumstances, the officer need not engage in any evaluation of the exculpatory nature of the evidence at all, nor need he or she determine whether such evidence might be "material" and so fall within the reach of Brady.  See, e.g., Walker v. City of New York, 974 F.2d 293, 299 (2d Cir. 1992).  The officer simply turns the case file over to the prosecutor, who is then charged with the obligation to evaluate that material and determine whether it should be produced under Brady or its progeny.  See Kyles v. Whitley, 514 U.S. 419, 437 (1995).  This case, however, presents an unusual circumstance.  Simmons is not alleged to have withheld any information in the investigative file relating to allegations that Reid sexually assaulted Misty.  Instead, Reid seeks to impose § 1983 liability on Simmons for having failed to disclose

8

to prosecutors arguably exculpatory and material evidence located in <u>other</u> police investigative files.

To prevail against Simmons on his § 1983 claim, Reid was obligated to prove, by a preponderance of the evidence, three essential elements: first, that his <u>Brady</u> rights were, in fact, violated during the course of his underlying state criminal prosecution; second, that Simmons' conduct caused that violation; and, finally, that Simmons acted with the requisite culpable state of mind.

A.    <u>Evidence of the Underlying Brady Violation</u>.

To carry his burden of proof on the first element, Reid relied, at least in part, on the state court's order vacating his criminal convictions, which he introduced (without objection) as a full exhibit.  He also relied on the testimony of state prosecutors who testified that, prior to Reid's criminal trial, they did not turn over the investigative reports at issue.  And, after the close of evidence, the court instructed the jury that, as a matter of law, for purposes of this case it was established that the two investigative reports that prosecutors failed to provide to Reid were both material and exculpatory.  <u>See</u> Jury

9

Instructions at 12. Thus, there was evidence from which a rational trier of fact might plausibly conclude that Reid's <u>Brady</u> rights were violated: the reports at issue were generated prior to Reid's criminal trial; they were both material and exculpatory; and prosecutors failed to turn them over to Reid or his counsel.

Although it is not central to the court's resolution of the pending motions, it is worth noting parenthetically that both the state court and the jury in this civil case might well have erred in concluding that Reid's <u>Brady</u> rights were violated. Specifically, at the hearing on Reid's motion to vacate his convictions, the state court accepted the prosecutor's offer of proof and concluded, based on that offer, that "Officer Simmons, who filed the earlier police reports, testified and made reference to these prior incidents [involving Misty] at the defendant's probable cause hearing. <u>From that time, the State was on notice that earlier reports existed</u>." <u>State v. Reid</u>, <u>supra</u>, at 5 (emphasis supplied). In other words, the state court concluded that, <u>because</u> Simmons testified about the other investigative reports involving Misty at Reid's August, 1986, probable cause hearing, the prosecutors were not only on notice

10

that those reports existed, but they knew of those reports <u>prior</u> to Reid's criminal trial and, therefore, should have turned them over to defense counsel.[1]

The state court then concluded that, "The State, not the defendant, had the obligation to provide the defendant with that evidence contained in those police reports." <u>State v. Reid</u>, <u>supra</u>, at 5. That is not, however, an entirely correct view of the prosecution's obligations under <u>Brady</u>. Accepting the fact

---

[1] As the court of appeals pointed out in <u>Reid II</u>, however, a prosecutor is duty bound under <u>Brady</u> to disclose material exculpatory evidence known to police acting in concert with the prosecutor, without regard to whether the prosecutor actually knows such evidence exists. A <u>Brady</u> violation does not depend on a prosecutor's pretrial knowledge that material exculpatory evidence exists. Consequently, the state court's "finding that Simmons disclosed the exculpatory reports to the prosecutors was not a necessary prerequisite to the judgment vacating Reid's conviction." <u>Reid II</u>, at *1. That is to say, for <u>Brady</u> purposes, the critical fact was the <u>existence</u> of those reports, and not the prosecutor's knowledge of their existence. For that reason, Reid was not estopped from arguing, in this forum, that Simmons did <u>not</u> testify about those reports at the probable cause hearing. Importantly, however, because the state court's order was, by agreement, entered as a full exhibit at trial, the court's findings of fact are, at a minimum, some evidence that Simmons did in fact testify about those reports. And, as discussed more fully below, the state court's order and the somewhat vague testimony of Simmons and the state prosecutors was the only evidence on one of the central issues in this case: whether Simmons disclosed to prosecutors the existence of those other investigative reports, thereby satisfying his obligations under <u>Brady</u>.

11

that Simmons testified about those reports at the probable cause hearing, as the state court did, that testimony not only placed the prosecution on notice of the existence of the other investigative reports, it necessarily also informed Reid and his counsel (both of whom were present at the probable cause hearing) that those reports existed, as well as their substantive content regarding prior alleged sexual abuse incidents involving Misty. Consequently, Reid (or his counsel) likely should have, in the exercise of reasonable diligence, recognized the exculpatory value of those reports and could have obtained copies of them simply by asking the prosecutor or the Manchester Police Department. As the court of appeals for this circuit has observed, "Brady does not require the government to turn over information which, with any reasonable diligence, the defendant can obtain himself." United States v. Pandozzi, 878 F.2d 1526, 1529 (1st Cir. 1989)(citations and internal quotation marks omitted). See also United States v. Grintjes, 237 F.3d 876, 880 (7th Cir. 2001) ("this court has repeatedly held that Brady does not apply to evidence that a defendant would have been able to discover himself through reasonable diligence."); Spivey v. Head, 207 F.3d 1263, 1283 (11th Cir.) (holding that to establish a Brady violation, a party must prove, among other things, that

12

"the defendant did not possess the evidence and could not obtain it with any reasonable diligence"), cert. denied, 121 S.Ct. 660 (2000); Johns v. Bowersox, 203 F.3d 538, 545 (8th Cir.) (holding that Brady is not violated "if the defendant could have learned of the information through 'reasonable diligence'"), cert. denied, 121 S.Ct. 629 (2000).

B.    Simmons' Conduct.

Even assuming that the jury properly concluded that Reid's Brady rights had been violated in his underlying state criminal prosecution when prosecutors failed to turn over the other investigative reports relating to prior alleged sexual assaults involving Misty (but in which Reid was never a suspect), Simmons never denied that prosecutors failed to disclose those reports to Reid. Instead, part of Simmons' defense focused on his claim to have adequately notified both prosecutors and Reid (and his counsel) of the existence of those reports, thereby satisfying his own, distinct obligations under Brady, regardless of the prosecutors' failings.

As noted above, demonstrating a Brady violation in his underlying criminal trial was only part of Reid's burden of proof

13

in this civil case.  As the concurring[2] members of the second en banc panel of the Fourth Circuit observed in <u>Collins</u>:

> A <u>Brady</u> violation that resulted in overturning of the
> § 1983 plaintiff's conviction is a necessary, but not a
> sufficient, condition for § 1983 liability on the part
> of the police.  It is a necessary condition because the
> <u>Brady</u> violation establishes the requisite threshold of
> constitutional injury (a conviction resulting in loss
> of liberty) below which no § 1983 action can lie.  It
> is not a sufficient condition, however, because the
> <u>Brady</u> duty is a no fault duty and the concept of
> constitutional deprivation articulated in both <u>Daniels</u>
> [474 U.S. 327 (1986)] and <u>Youngblood</u> [488 U.S. 51
> (1988)] requires that the officer have intentionally
> withheld the evidence for the purpose of depriving the
> plaintiff of the use of that evidence during his
> criminal trial.  This is what is meant by "bad faith."

---

[2]    Following the lead of dissenting Judge Murnaghan, the court has referred to the second en banc opinion in <u>Collins</u> as the "concurrence," because, eventually, the judgment of the district court was affirmed by an evenly divided court of appeals.  The procedural history of that case is lengthy: the district court granted the police officers' motion for summary judgment, based on qualified immunity.  A court of appeals panel initially reversed and remanded, <u>Collins</u>, 107 F.3d 1111 (4th Cir. 1997), but on rehearing, the court, sitting en banc, affirmed the district court.  <u>Collins</u>, 155 F.3d 701 (4th Cir. 1998).  The Supreme Court then granted certiorari, vacated the en banc court's decision, and remanded the case for further consideration.  <u>Collins</u>, 526 U.S. 1142 (1999).  On remand, an equally divided en banc court held that plaintiff failed to establish that his constitutionally protected rights had been violated.  <u>Collins</u>, 221 F.3d 656 (4th Cir. 2000).  The Supreme Court denied further review.  <u>Collins</u>, 121 S.Ct. 771 (2001).  The history of <u>Collins</u> reveals the scope of the legal debate relating to police officer liability for <u>Brady</u> violations.  It also tends to undermine any assertion that the precise contours of a criminal defendant's constitutionally protected rights in this area are, even today, "clearly established."

14

Jean v. Collins, 221 F.3d at 663. See also Ahlers v. Schebil, 994 F. Supp. 856, 871 (E.D. Mich. 1998) (concluding that proving an underlying Brady violation is only one element of a § 1983 claim against police officers), aff'd., 188 F.3d 365 (6th Cir. 1999).

So, after demonstrating that his Brady rights were violated, Reid was then obligated to prove some degree of culpability on Simmons' part. It is, perhaps, important to reiterate that Reid's Brady rights were violated, if at all, when prosecutors (who ultimately bear responsibility under Brady for turning over exculpatory material to the defendant) failed to disclose the investigative reports in question. That violation of Reid's rights could have occurred notwithstanding Simmons' disclosure of those reports to the prosecutors (as it appears the state court concluded it did). In other words, mere evidence of the prosecutors' failure to meet their discrete no-fault Brady obligation to turn over exculpatory evidence does not necessarily expose police investigators involved in the case to § 1983 liability, absent some culpable and causative action or inaction by them.

15

At trial in this civil case, Reid did not testify and, therefore, did not present to the jury his own account of how Simmons allegedly failed to reveal the evidence in question to prosecutors.[3] The prosecutors who handled Reid's criminal trial testified that they could no longer remember how they came to learn that Simmons testified about those reports at the probable cause hearing (at which it appears the State's interests were represented by different counsel). Simmons also testified that because Reid's probable cause hearing took place so long ago, he could not specifically recall his testimony about the other investigative reports relating to Misty, but that it was his understanding, memory, and best recollection that he did testify about them at Reid's probable cause hearing. See Trial transcript, vol. II, at 29, 58. Unfortunately, however, neither party was able to produce a transcript of that hearing.

---

[3]     As noted by the court of appeals in Reid II, prior to trial Reid submitted several affidavits in which he "hotly disputed" whether Simmons testified about the other investigative reports concerning Misty at the August 22, 1986, probable cause hearing. See Reid II, at * 1. At trial, however, Reid did not testify to the claims he made in those affidavits, and evidence tending to show that Simmons did testify about those reports at the probable cause hearing was unrebutted.

16

To be sure, Reid did produce evidence from which the jury could have reasonably concluded that Simmons did not affirmatively turn over to prosecutors the investigative reports related to prior alleged incidents of sexual abuse involving Misty: prosecutors never produced those reports in response to pre-trial discovery requests from Reid; they testified that those reports were not included in the materials initially sent to them by the Manchester Police Department; and they testified that they never had those reports prior to Reid's criminal trial. From that evidence, a rational trier-of-fact might reasonably concluded that Simmons never provided those earlier investigative reports to prosecutors.

But, as noted above, Simmons never contended that he had affirmatively handed those reports over to prosecutors and did not seek to rebut Reid's evidence on that point. Instead, part of Simmons' defense centered on his claim to have adequately revealed the existence of those reports (to prosecutors, Reid, and his counsel) to put them on notice of their existence and to impose upon them the obligation to review those reports and make the legal determination as to whether they were both material and exculpatory and, therefore, within the scope of Brady.

17

The evidence on that point was unrebutted and consisted of: (1) Simmons' reference (albeit somewhat vague) to his prior contacts with Misty in his investigative report concerning Reid's alleged assault on Misty; (2) Simmons' testimony concerning his general belief that he had testified at the probable cause hearing about the other investigative reports concerning Misty; (3) Simmons' testimony that he had, in or about 1992, submitted an affidavit in which he testified that he had discussed those other investigative reports at the probable cause hearing; (4) evidence concerning the offer of proof made by state prosecutors at the hearing on Reid's motion to vacate his convictions (an offer of proof to which neither Reid nor his counsel objected); and (5) the state court's October 13, 1988, order, which Reid entered as a full exhibit. In that order, the state court accepted the prosecutor's offer of proof regarding Simmons' testimony at the earlier probable cause hearing and concluded that Simmons, "who filed the earlier police reports, testified and made reference to these prior incidents at [Reid's] probable cause hearing." State v. Reid, supra, at 5. So, to the extent any of that evidence is probative on this issue, it substantially undermines Reid's case — showing that, in fact, Simmons disclosed the existence and substantive content of those investigative

18

reports (and, consequently, was not engaged in any deliberate attempt to conceal that evidence).

Regardless of the evidentiary value of the state court's order, or the lack of clarity with which Simmons described his recollection of having testified about those investigative reports at Reid's probable cause hearing, or the somewhat vague references to Simmons' 1992 affidavit in which he described that testimony, however, the important point is this: Reid introduced no evidence at trial that tended to undermine that evidence. Thus, record evidence is unrebutted concerning Simmons' testimony about those investigative reports at the probable cause hearing. It is also undisputed that Simmons specifically alluded to his prior contacts with Misty in the investigative report relating to Reid's alleged misconduct, which report was turned over to Reid.

Consequently, even reviewing the record evidence in the light most consistent with the jury's verdict, the court is compelled to conclude that a "a reasonable jury could not render a verdict in [Reid's] favor." Irvine, 194 F.3d at 316. Specifically, two of the jury's factual findings are unsupported by the evidence produced at trial: first, the jury's conclusion

19

that Simmons did <u>not</u> "have reason to believe that the prosecutors in [Reid's] state criminal trial possessed or knew of the December 20, 1985, and April 4, 1986, police reports concerning Misty prior to [Reid's] state criminal trial," <u>see</u> Jury Verdict Form, Question 3; and second, the jury's conclusion that Simmons "deliberately acted to suppress or conceal such reports from the prosecutors in [Reid's] state criminal trial, or failed to disclose those reports to prosecutors with reckless or callous indifference to plaintiff's constitutional rights." <u>See</u> Jury Verdict Form, Question 4(b). As a result, the jury's verdict cannot stand, and Simmons is entitled to judgment as a matter of law.

II. <u>Evidence of Simmons' Intent or State of Mind</u>.

Even if Reid had introduced evidence tending to show that Simmons failed to disclose to prosecutors information about the other investigative reports, he did not meet his burden of proving that Simmons acted with the requisite culpability necessary to establish liability under § 1983. While <u>Brady</u> established a no-fault obligation on the part of <u>prosecutors</u> to turn over exculpatory evidence, civil liability on the part of a police officer under § 1983 does not attach absent some evidence

20

that the officer acted, at a minimum, with less than good faith. For example, in <u>Arizona v. Youngblood</u>, 488 U.S. 51 (1988), the Supreme Court held that, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process." <u>Id.</u> at 58. The Court based its decision, at least in part, on:

> our unwillingness to read the "fundamental fairness" requirement of the Due Process Clause as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution. We think that <u>requiring a defendant to show bad faith on the part of the police</u> both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., <u>those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant</u>.

<u>Id.</u> (emphasis supplied). <u>See also</u> <u>Daniels v. Williams</u>, 474 U.S. 327, 328 (1986) (holding, in the context of a prisoner § 1983 suit against prison officials, that "the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property.").

The concurring judges of the en banc panel in <u>Collins</u> understood <u>Youngblood</u> and <u>Daniels</u> to impose on civil plaintiffs, who claim that their constitutional right to due process was violated by police officers' failure to turn over potentially exculpatory material, the burden of proving that the officers in question acted in bad faith.

> While <u>Youngblood</u> dealt with the failure to preserve evidence, its principles are certainly applicable to the present situation. Here, as in <u>Youngblood</u>, the prosecutor and ultimately the defense allegedly failed to receive exculpatory evidence from the police. Here, as in <u>Youngblood</u>, the police officers' actions were alleged to constitute a due process violation. The <u>Youngblood</u> Court stressed its "unwillingness" to read the Due Process Clause to impose "on the police an undifferentiated and absolute duty" in that context.
>
> We similarly decline to impose a sweeping duty on the police in the instant situation and note the obvious drawbacks of doing so. . . . To confer on prosecutors absolute immunity while denying to police the right to argue even bona fides would multiply exponentially litigation against even conscientious officers.

<u>Jean v. Collins</u>, 221 F.3d at 661. Consequently, the concurring judges determined that "police officer negligence or inadvertence in failing to turn over evidence cannot be actionable under § 1983." <u>Id.</u> at 660. This court agrees. A § 1983 plaintiff cannot prevail on his claim that a police officer deprived him of his constitutionally protected right to due process merely by

22

demonstrating that a <u>Brady</u> violation occurred during the course of the plaintiff's underlying criminal trial.  Instead, the plaintiff must also show that the officer acted in bad faith, or with the intent to violate the plaintiff's constitutional rights, or with deliberate indifference to those rights.

In this case, Reid failed to introduce sufficient evidence to permit a jury to find, by a preponderance, that Simmons acted in bad faith.  Even if one were to ignore the evidence that Simmons openly discussed the existence and substantive content of the investigative reports in the presence of Reid, his counsel, prosecutors, and the judge at Reid's probable cause hearing, and evidence that he referenced his prior contacts with Misty in the report prepared in connection with his investigation into Reid's alleged assault on Misty (all of which plainly suggests Simmons did not attempt to conceal the existence of those files), there is no evidence suggesting that Simmons acted with the requisite culpable state of mind.

To the contrary, the record evidence establishes that Simmons prepared the reports in connection with earlier investigations into different alleged incidents of abuse

23

involving Misty in the ordinary course, routinely placed those reports into the appropriate files, labeled those files accurately, and routinely placed them into the indexed repository for the police department's investigative files, where they were readily retrievable (cross-indexed by the pertinent juvenile's name), and available to interested parties like Reid and the state prosecutors.  None of the record evidence even remotely suggests that Simmons actively concealed the existence of those files, removed relevant material from them, or mis-filed them in an effort to make them unavailable to the defense or prosecution. Cf. McMillian, 88 F.3d at 1560-61 (police officers were accused of deliberately placing exculpatory evidence relevant in one case into another investigative file for the purpose of concealing it from prosecutors).

That Simmons might have relied on the prosecutors to routinely (1) review the police department's investigative files concerning past alleged incidents of sexual abuse involving Misty and (2) determine what material from those investigative files might have exculpatory value in the context of Reid's ongoing prosecution for an entirely different alleged incident, would seem quite reasonable in light of the systems that were in place

24

in the Manchester Police Department at the time.  This is particularly true in light of the testimony provided by Paul McDonough (one of Reid's prosecutors), who said that "once the case is accepted by the county attorney's office, it's the county attorney's office who traditionally meets the discovery requests and requirements, including the Brady requirement."  Trial Transcript, vol. 3, at 14.  At the very most, Simmons' reliance upon prosecutors to review the relevant records and extract any material evidence would constitute a negligent oversight.

A showing of mere negligence is, however, insufficient.  It falls far short of bad faith, or the type of culpable state of mind required to impose upon Simmons personal liability under § 1983.  And, because the exculpatory character of the evidence in question is so subtle, particularly from the perspective of a non-lawyer, see Reid I, 56 F.3d at 334 n.2, one cannot reasonably infer bad faith on Simmons' part merely because he did not affirmatively retrieve it and deliver it to the prosecutors.  See Youngblood, 488 U.S. at 58 (limiting police liability to situations in which they act in bad faith or, by their conduct, reveal that they actually appreciated the potentially exculpatory

25

nature of the destroyed (or, by extension, withheld) evidence in question).

Here, there is no evidence that, _prior_ to Reid's criminal trial, Simmons actually appreciated the exculpatory and material nature of the prior investigative reports concerning Misty. Nor is there any evidence that he actively sought to conceal those reports or otherwise prevent prosecutors from learning of their existence. In fact, the evidence suggests just the opposite. Consequently, the only way the jury could have concluded that Simmons acted in bad faith in failing to affirmatively turn over evidence he knew fell within the bounds of _Brady_ was based upon an inference arising out of the nature of that evidence itself.

To be sure, there may be cases in which a police officer is aware of evidence located in a separate investigative file that is so patently exculpatory (e.g., DNA, fingerprint, ballistic, or alibi evidence tending to exonerate the defendant) that it may fairly be inferred that the officer fully appreciated its legal significance in the case at hand. _Cf._ _Youngblood_, 488 U.S. at 58 (noting that police officers' conduct itself may sometimes suggest that they appreciate the exculpatory nature of certain

26

evidence). Consequently, in those cases a trier-of-fact might reasonably <u>infer</u> that the officer acted in bad faith when he or she failed to disclose such plainly exculpatory evidence to the prosecution. <u>See, e.g.</u>, <u>McMillian</u>, 88 F.3d at 1560-61.

This, however, is not such a case. There is no direct evidence of deliberate concealment by Simmons, and the reports in question are not so plainly exculpatory as to be capable of supporting an inference that Simmons acted in bad faith based simply upon his failure to disclose their existence to the prosecution (again, ignoring for the moment that the only relevant evidence on that point — the Superior Court's order, the prosecutor's belief and understanding, and Simmons' belief and understanding - tends to establish that Simmons <u>did</u> reveal the reports' existence and content to the prosecution <u>and</u> to defense counsel <u>and</u> Reid himself at Reid's probable cause hearing). To the contrary, the exculpatory nature of the investigative reports at issue is so subtle, and an appreciation of their potential value as impeachment evidence requires such a sophisticated understanding of criminal trial practice, that no reasonable trier of fact could conclude that Simmons' failure to turn over those reports to prosecutors was <u>necessarily</u> the product of bad

27

faith.  The evidence does not, as a matter of law, support that inference.

From a litigator's perspective, prior to trial, the investigative reports would be seen as potentially useful to impeach Misty's credibility, or to challenge her ability to perceive and accurately relate historical facts, or to undermine the inference that she necessarily obtained adult-like knowledge of sexual conduct as a result her alleged contact with Reid. Those reports would, however, only be useful at Reid's criminal trial if the prosecution called Misty as a witness (of course, police investigators would not necessarily be aware of a prosecutors' trial plan) and then, only if she testified in a way that made statements or evidence referenced in those other reports relevant. Here, Simmons no doubt would have anticipated that Misty would testify against Reid, but neither Simmons nor a reasonable officer in his position would have anticipated that she might deny matters related in those reports, or that in defense counsel's hands those reports would constitute impeachment evidence of a material nature.  Those are lawyer-like recognitions or appreciations, quite different from a police officer's recognizing evidence that tends to exonerate the

28

defendant, or flatly contradicts testimony of a government witness that goes to guilt or innocence.

To charge the ordinarily prudent police officer with an obligation to engage in a prospective and lawyer-like analysis of evidence that is only conditionally relevant, and to impose upon him or her the duty to determine the potential exculpatory value of such evidence (a prerequisite to recognizing an obligation to disclose) is unrealistic and, indeed, inappropriate.

How (or even whether) the reports might have been useful to the defense at Reid's criminal trial is a matter police investigators were simply not trained to recognize, and involves an analytical function not imposed on them by the criminal justice system. Consequently, this much can be said with confidence: it would be unreasonable to charge an ordinarily prudent police officer, prior to trial and without benefit of knowing whom the prosecutors intended to call as witnesses, how those witnesses would likely testify, or how the prosecutors intended to prove their case, with an appreciation of the potential impeachment value of investigative reports in unrelated

29

case files which, in the right attorney's hands, might prove useful.

Simply stated, police officers cannot be held liable for civil damages in § 1983 suits for having failed to engage in a sophisticated evidentiary analysis to determine whether investigative notes in police records (particularly those relating to prior incidents, distinct from those giving rise to the prosecution at hand) might be considered both material and exculpatory and, therefore, fall within the scope of a police officer's duty to disclose to prosecutors under <u>Brady</u>. Again, the concurring opinion in <u>Collins</u> is instructive.

> The <u>Brady</u> duty is framed by the dictates of the adversary system and the prosecution's legal role therein. Legal terms of art define its bounds and limits. The prosecutor must ask such lawyer's questions as whether an item of evidence has "exculpatory" or "impeachment" value and whether such evidence is "material." It would be inappropriate to charge police with answering these same questions, for their job of gathering evidence is quite different from the prosecution's task of evaluating it. This is especially true because the prosecutor can view the evidence from the perspective of the case as a whole while police officers, who are often involved in only one portion of the case, may lack necessary context. To hold that the contours of the due process duty applicable to the police must be identical to those of the prosecutor's <u>Brady</u> duty would thus improperly mandate a one-size-fits-all regime.

<u>Id.</u> at 660.

30

This suit makes plain that with regard to § 1983 claims against police officers arising from a <u>Brady</u> violation, a "no-fault" or "strict liability" standard is neither appropriate nor advisable. Absent evidence tending to show that a police officer was consciously aware of, and appreciated or should have appreciated the exculpatory and material nature of evidence in other case files, there can be no civil liability under § 1983 for having failed to turn over such evidence to the prosecutor. To conclude otherwise would require every police officer to possess a comprehensive understanding of rules of evidence and procedure, as well as the myriad and subtle ways in which seemingly irrelevant evidence (from a lay perspective) might be effectively used by skilled criminal defense counsel at a subsequent trial. In this case, it would impose on Simmons the legal obligation, in 1987, to have revisited (at least mentally and perhaps by means of a physical review) every contact he might have had, in every investigation he might have conducted, with Misty and any other person who might reasonably have been called as a witness by the prosecution in Reid's criminal trial. If such an obligation even exists under <u>Brady</u>, it was not an obligation known to police in 1987.

Police officers are called upon to investigate crimes in a fair and balanced way, collect relevant evidence and information, document the results of their investigations, and make those results available to appropriate parties in law enforcement wishing to review that material. Under Brady, they are also duty bound to turn over to prosecutors all evidence they recognize as, or should recognize as, material and exculpatory, that is developed in the criminal case under investigation. With regard to any other evidence (e.g., evidence developed in other distinct investigations or different cases) police officers must, of course, disclose to prosecutors that which they actually know or should know has exculpatory value and material significance in a case being prosecuted. With regard to material located in other investigative files of subtle or even arguable exculpatory value in the prosecution at hand, however, prosecutors (looking prospectively) and judges (looking retrospectively) are and must remain the parties charged with the obligation to determine legal significance under Brady and its progeny.

III. Qualified Immunity.

Even if Reid had introduced evidence sufficient to support a finding that Simmons knowingly or intentionally withheld the

32

investigative reports at issue in this case, Simmons would still be entitled to qualified immunity.

Having concluded that the evidence introduced at trial cannot support a finding that Simmons violated any of Reid's federally protected rights, it ordinarily would not be necessary to reach the issue of qualified immunity. Nevertheless, because this case has such a long history (to date, spanning roughly 12 years and involving two appeals to the circuit court of appeals), and because it will, no doubt, continue on from here, it is appropriate to resolve Simmons' alternative claim to qualified immunity as well.

A government official is entitled to qualified immunity from personal liability if the challenged "'conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Aversa v. United States, 99 F.3d 1200, 1214 (1st Cir. 1996) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The challenged conduct is measured by a standard of objective reasonableness, that is: "Could an objectively reasonable official, situated similarly to the defendant, have believed that his conduct did not violate the

plaintiff['s] constitutional rights, in light of clearly established law and the information possessed by the defendant at the time of the allegedly wrongful conduct?" Wood v. Clemons, 89 F.3d 922, 927 (1st Cir. 1996). And, as the Court of Appeals for the First Circuit recently observed,

> To determine a defendant's eligibility for qualified immunity, courts must define the right asserted by the plaintiff at an appropriate level of generality and ask whether, so characterized, that right was clearly established when the harm-inducing conduct allegedly took place. This does not mean that a right is clearly established only if there is precedent of considerable factual similarity. It does mean, however, that the law must have defined the right in a quite specific manner, and that the announcement of the rule establishing the right must have been unambiguous and widespread, such that the unlawfulness of particular conduct will be apparent ex ante to reasonable public officials. After all, qualified immunity for public officials serves important societal purposes, and it is therefore meant to protect all but the plainly incompetent or those who knowingly violate the law.

Brady v. Dill, 187 F.3d 104, 116 (1st Cir. 1999) (citations and internal quotation marks omitted) (emphasis supplied).

Importantly, as suggested in Dill, a defendant does not lose the protection of qualified immunity if he acts mistakenly, as long as his mistake was objectively reasonable, as qualified immunity is intended to protect "'all but the plainly incompetent

34

or those who knowingly violate the law.'" Veilleux v. Perschau, 101 F.3d 1, 3 (1st Cir. 1996) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

A preliminary question, therefore, is whether Reid's asserted constitutional right to have Simmons disclose the investigative reports in question was "clearly established" in 1987 (at the time of Reid's criminal trial). Of course, how one phrases the question likely dictates the answer. For example, one might say, without much fear of contradiction, that in 1987 it was clearly established that prosecutors are obligated to turn over to defense counsel any and all material exculpatory evidence in the government's possession, even if that evidence is known only to police officers. See Kyles v. Whitley, 514 U.S. at 437. See generally Brady, supra. One might even say that, by the late 1980's, it was clearly established (at least in other circuits) that police officers had a constitutional obligation not to affirmatively conceal or destroy evidence they know to be exculpatory. See Jones v. City of Chicago, 856 F.2d 985, 993-97 (7th Cir. 1988)(defendant police officers "systematically concealed from the prosecutors" patently exculpatory evidence); Geter v. Fortenberry, 849 F.2d 1550, 1559 (5th Cir. 1988) ("a

35

police officer cannot avail himself of a qualified immunity defense if he . . . <u>deliberately</u> <u>conceals</u> exculpatory evidence, for such activity violates clearly established constitutional principles.") (emphasis supplied).

If, however, one poses the question at a level of generality more appropriate to this case, the answer is not so self-evident. For example, if the relevant inquiry is defined as whether, in 1987, it was clearly established that police officers had a constitutionally mandated obligation to turn over reports or other evidence that is not, on its face, patently "exculpatory," but which, in the right defense counsel's hands, might nevertheless prove effective for impeachment purposes, one would be hard-pressed to answer in the affirmative. That is particularly true since only recently have courts begun to conclude that police officers might bear some liability under § 1983 for withholding material evidence that leads to a <u>Brady</u> violation. <u>See, e.g.</u>, <u>Brady v. Dill</u>, 187 F.3d 104, 114 (1st Cir. 1999) ("a police officer <u>sometimes</u> may be liable if he fails to apprise the prosecutor or a judicial officer of <u>known</u> exculpatory information.")(citing cases from other circuits)(emphasis supplied). <u>See also</u> <u>Jean v. Collins</u>, 221 F.3d at 659 ("The

Supreme Court decisions establishing the Brady duty on the part of prosecutors do not address whether a police officer independently violates the Constitution by withholding from the prosecutor evidence acquired during the course of an investigation.  Recent cases, including some from this circuit, have pointed toward such a duty. . . . These cases have left unclear the exact nature of any duty that the law imposes on police with regard to exculpatory evidence.") (citations omitted).  In other words, the notion that police officers can be personally civilly liable for conduct giving rise to Brady violations is a relatively recent development in the law and, even today, its character and contours remain somewhat ill-defined, particularly in this circuit.

To the extent Simmons had a constitutional obligation to turn over to prosecutors the investigative reports at issue in this case (a debatable proposition), that obligation certainly was not "clearly established" in 1987.  That is to say, even if one might reasonably argue that, by 1987, some courts had established the rule that police officers must, at the risk of violating a criminal defendant's constitutional rights, turn over to prosecutors all "exculpatory" evidence (even when the

37

exculpatory nature of such evidence is not self-evident and may even be quite subtle), the "announcement of [that] rule establishing the right" was not so "unambiguous and widespread" that the unlawfulness of Simmons' alleged failure would have been apparent to any reasonable police officer. Brady v. Dill, 187 F.3d at 116. Nor is there anything in this record to suggest that Simmons was either "plainly incompetent" or that he "knowingly violate[d] the law" in failing (if he did) to disclose the existence and content of the disputed reports to prosecutors. See Veilleux, 101 F.3d at 3. See also Ahlers, 994 F. Supp. at 871-72 (concluding that even though the plaintiff demonstrated that his Brady rights had been violated, the defendant police officers were entitled to qualified immunity because the plaintiff failed to show that the officers acted recklessly, maliciously, deliberately, or in bad faith to violate his constitutional rights).

Moreover, regardless of how one phrases the constitutional question at issue here (i.e., even if the constitutional rule had been "clearly established"), one thing is manifestly clear. An objectively reasonable police officer standing in Simmons' shoes in 1987, prior to Reid's criminal trial, would not have

38

appreciated either the potentially exculpatory or material nature of the reports located in the other investigative files pertaining to unrelated possible incidents of sexual abuse of Misty. Consequently, such an officer would not have understood that the failure to disclose them to prosecutors would violate the criminal defendant's constitutional right to a fair trial. Simmons is, therefore, entitled to qualified immunity — even if the evidence supported a finding that Simmons failed to disclose the existence and content of those reports to prosecutors before trial.

This point was made clear by the Eleventh Circuit Court of Appeals in <u>McMillian</u>, <u>supra</u>. In that case, the plaintiff sought to recover damages from several police officers whom he said purposefully concealed exculpatory evidence in his underlying criminal trial. In considering whether the officers might avail themselves of qualified immunity, the court made the following observations:

> Our conclusion that [the defendant police officers'] duties under <u>Brady</u> were clearly established does not end the inquiry. It remains to be determined whether a reasonable officer in [the defendants'] position would know, when they acted, that the evidence withheld from the prosecutor was material, that is, that withholding the evidence would undermine confidence in the outcome

39

of [plaintiff's] trial.  For <u>if a reasonable officer</u> <u>would not know that the exculpatory and impeachment</u> <u>evidence was material, he would not know that "what he</u> <u>is doing" violates federal law in the circumstances</u>.

* * *

The district court held that several pieces of withheld evidence were clearly exculpatory.  However, the district court did not ask whether every reasonable official in the position of [the defendant officers] would understand that withholding those particular pieces of evidence would undermine confidence in the outcome of [plaintiff's] trial.  <u>The court viewed the</u> <u>evidence with the benefit of hindsight</u>, knowing what evidence actually was presented at trial, and agreed with [the state court] that the evidence withheld was material.  <u>But [the police officers] did not have the</u> <u>benefit of knowing exactly how the totality of the</u> <u>evidence would play out at trial.  It is from their</u> <u>perspective that the district court should have</u> <u>analyzed whether the evidence was material</u>, and we remand for the district court to do so.

<u>McMillian</u>, 88 F.3d at 1569-70 (emphasis supplied).  Viewing the evidence at issue in this case from the perspective of a reasonable police officer, prior to Reid's criminal trial, one cannot plausibly conclude that the officer should have understood that, by failing to affirmatively call the prosecutors' attention to the reports in question, he was violating Reid's clearly established constitutional rights.

In summary, because it was not clearly established in 1987 that a police officer's failure to disclose potentially, though

40

not obviously, exculpatory impeachment material (particularly that which was generated in unrelated investigations) would constitute a discrete and actionable violation of the defendant's constitutional right to due process (independent of the <u>Brady</u> violation which is, of course, caused by the <u>prosecutor's</u> failure to turn over such information), Simmons is entitled to qualified immunity. He is also entitled to the protections afforded by qualified immunity because an objectively reasonable police officer in his situation in 1987, looking forward before Reid's criminal trial, would not have appreciate the potentially material <u>and</u> exculpatory nature of the investigative reports in question. So, even if Simmons did fail to disclose the reports, he cannot be charged with having understood that such a failure would violate federal law by depriving Reid of his right to due process and a fair trial. See <u>McMillian</u>, 88 F.3d at 70.

IV. <u>New Trial</u>.

Alternatively, if Simmons is not entitled to judgment as a matter of law based on a failure of proof, or to qualified immunity, he is still entitled, on this record, to a new trial under Fed. R. Civ. P. 59(a). For the reasons previously discussed, the jury's verdict in favor of Reid was, in the

41

court's judgment, "sitting as a 13th juror," against the great weight of the evidence. As noted above, even assuming Reid's <u>Brady</u> rights were violated in his underlying criminal trial, Reid failed to introduce evidence from which a jury could find: (1) that Simmons acted with the requisite culpable state of mind; or (2) that a reasonable officer in Simmons' situation would have appreciated (or even should have appreciated) the exculpatory nature of the investigative reports at issue in this case. Since, on this record, Reid introduced insufficient evidence to establish those essential elements of his claim, Simmons is entitled to a new trial.

Consequently, if Simmons' motion for judgment as a matter of law is incorrectly granted, his motion for a new trial is, alternatively, granted. <u>See</u> Fed. R. Civ. P. 50(c) ("If the renewed motion for judgment as a matter of law is granted, the court shall also rule on the motion for new trial.").

## Conclusion

This case presents an unusual set of facts that gives rise to complex, difficult, and still developing issues of law. Despite his lack of formal legal training, Mr. Reid has

42

unquestionably done a fine job of pursuing his claims.  As
evidenced by its verdict, the jury certainly found that he
presented a persuasive and sympathetic case, and it would do Mr.
Reid a disservice if the court did not also acknowledge that his
trial conduct was exemplary, his points well presented, and his
examinations and argument well done indeed.  Nevertheless, in
light of the evidence actually presented at trial and the
established law governing Reid's § 1983 claim, the court is
persuaded that Simmons is entitled to judgment as a matter of
law.

The failure here was the prosecutors'; although fully
cognizant of their obligation to provide exculpatory impeachment
evidence, and indeed to comply with an apparent pre-trial
discovery order specifically directing them to produce such
evidence, they did not make even a modest effort to search the
indexed and retrievable files of the Manchester Police
Department.  The evidence at trial made clear that the
investigative reports at issue in this case were readily
available, through no effort more burdensome than a simple
request.  The unfortunate consequence of the prosecutors' conduct
was that Reid might well have been wrongly convicted of a crime

43

he did not commit.  That error was, however, corrected when the state court vacated Reid's convictions.

Under the circumstances presented, Simmons satisfied the constitutional obligations he owed to Reid by taking the investigative notes in question, properly filing them in the indexed files, and by neither acting nor failing to act for the purpose of concealing or otherwise preventing the prosecutors (and thereby the defense) from obtaining those reports.  Of course, if the court of appeals is of the view that this court has erred, it will certainly not hesitate to correct those errors and reinstate the jury's substantial verdict in favor of Reid or remand the matter for retrial, as it deems appropriate.

In light of the forgoing, defendant's motion for judgment as a matter of law (document no. 309) is granted.  His motion for a new trial (document no. 310) is, alternatively, granted as well. The remaining pending motions (documents no. 311, 315, 318, 319, 320, 325, 326, 331, 332, and 333) are all denied as moot.  The clerk of Court shall enter judgment in favor of defendant Gary Simmons and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

March 30, 2001

cc:  Robert G. Whaland, Esq.
     Gordon C. Reid